IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BACKERTOP LICENSING LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 22-572-CFC |
| | ) | |
| CANARY CONNECT, INC., | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| BACKERTOP LICENSING LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 22-573-CFC |
| | ) | |
| AUGUST HOME, INC., | ) | |
| | ) | |
| Defendant. | ) | |

David L. Finger, FINGER & SLANINA, LLC, Wilmington, Delaware; Jimmy C. Chong, CHONG LAW FIRM, PA, Wilmington, Delaware; Ronald W. Burns, Frisco, Texas

*Counsel for Plaintiff Backertop Licensing LLC*

David L. Finger, FINGER & SLANINA, LLC, Wilmington, Delaware

*Counsel for Lori LaPray*

Alan Richard Silverstein, CONNOLLY GALLAGHER LLP, Wilmington, Delaware; Mark K. Suri, HINSHAW & CULBERTSON LLP, Chicago, Illinois

*Counsel for Defendant Canary Connect, Inc.*

Jeremy Douglas Anderson, FISH & RICHARDSON, P.C., Wilmington, Delaware;
Ricardo J. Bonilla, FISH & RICHARDSON, P.C., Dallas, Texas

*Counsel for Defendant August Home, Inc.*

## **MEMORANDUM OPINION**

August 21, 2023
Wilmington, Delaware

_____
COLM F. CONNOLLY
CHIEF JUDGE

I held on August 1, 2023 a hearing to provide Plaintiff Backertop Licensing

LLC and its sole member and owner, Ms. Lori LaPray, an opportunity to show

cause as to why Ms. LaPray should not be held in civil contempt for refusing to

comply with a May 31, 2023 Memorandum Order requiring Ms. LaPray to appear

at a hearing held on July 20, 2023 and for what Backertop and Ms. LaPray

characterize as their "declin[ing] to participate further" in these proceedings, No.

22-572, D.I. 48 at 19; No. 22-573, D.I. 52 at 19.[1]  I had ordered Ms. LaPray to

appear on July 20 "to address at least Mr. Chong's motion to withdraw [as counsel

for Backertop] and the document production made by Backertop on May 9[,

2023]."  D.I. 37 at 8 (citations omitted).  The reasons that gave rise to that order are

set forth in detail in my May 1, 2023 Memorandum Opinion;[2] May 31, 2023

Memorandum Order;[3] July 10, 2023 Memorandum Opinion;[4] and *Nimitz*

---

[1] Backertop's filings are identical in both actions.  Unless otherwise noted, all
citations to Backertop's filings that follow are from Civil Action No. 22-572.
[2] D.I. 32 (also found at *Backertop Licensing LLC v. Canary Connect, Inc.*, 2023
WL 3182084 (D. Del. May 1, 2023)).
[3] D.I. 37 (also found at *Backertop Licensing LLC v. Canary Connect, Inc.*, 2023
WL 3736766, at *1 (D. Del. May 31, 2023), *reconsideration denied,* 2023 WL
4420467 (D. Del. July 10, 2023)).
[4] D.I. 45 (also found at *Backertop Licensing LLC v. Canary Connect, Inc.*, 2023
WL 4420467, at *1 (D. Del. July 10, 2023)).

*Technologies LLC v. CNET Media, Inc.*, 2022 WL 17338396 (D. Del. Nov. 30, 2022), all of which I incorporate herein.

Ms. LaPray did not appear at the August 1 hearing.  D.I. 55 at 4:2–5.  Backertop's newly added counsel, Mr. David Finger, stated at that hearing that "these proceedings should not be going forward" and that Backertop and Ms. LaPray would "stand on" the arguments set forth in the Motion to Dismiss Contempt Proceeding (the Motion) they filed on July 28, 2023 (D.I. 54).  D.I. 55 at 3:8–4:1.

### I.

None of the arguments made in the Motion provides good cause for Ms. LaPray's refusal to comply with the May 31, 2023 Memorandum Order and to participate further in these proceedings.

The principal argument of the Motion is that I "lack[ ] authority to pursue this contempt proceeding" because "the underlying proceedings are moot" due to "Backertop voluntarily dismiss[ing] its complaints in September 2022, and Backertop and the Defendants fil[ing] joint stipulations of dismissal in April 2023 and June 2023."  D.I. 54 at 1–4 (some capitalization omitted) (footnote omitted).  Although a "nonparty witness may defend against a civil contempt adjudication by challenging the subject-matter jurisdiction of the district court," *U.S. Cath. Conf. v. Abortion Rts. Mobilization, Inc.*, 487 U.S. 72, 74 (1988), I already rejected

Backertop and Ms. LaPray's mootness argument in the May 1, 2023 Memorandum

Opinion.  As I explained in relevant part there:

> "It is well established that a federal court may consider collateral issues after an action is no longer pending." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 395 (1990). . . .

> The Court specifically held in *Cooter* that a voluntary dismissal under Rule 41(a)(1) does not deprive a district court of jurisdiction over a Rule 11 motion.  *Id.* at 398. But as the Third Circuit (whose law governs this Court's exercise of its inherent powers) recognized in *Haviland v. Specter*, 561 F. App'x 146, 150 (3d Cir. 2014), there is no "principled reason why the Court's decision [in *Cooter*] would not apply equally to sanctions imposed pursuant to a district court's inherent authority."

> What I said in *Nimitz* bears repeating here:

>> "It has long been understood that '[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution,' powers 'which cannot be dispensed with in a Court, because they are necessary to the exercise of all others.'" *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (quoting *United States v. Hudson*, 11 U.S. 32, 34 (1812)).  "These powers are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Id.* (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630–31 (1962)).

>> The Supreme Court has expressly held that a federal court's inherent powers include the powers I have exercised here: "the power to

> control admission to its bar and to discipline
> attorneys who appear before it," *id.*, the
> power to enforce compliance with court
> orders, *see id.*, and "the power to conduct an
> independent investigation in order to
> determine whether [the court] has been the
> victim of fraud." *Id.* at 44. These powers
> extend to nonparties. *See Manez v.*
> *Bridgestone Firestone N. Am. Tire, LLC*, 533
> F.3d 578, 585 (7th Cir. 2008) ("No matter
> who allegedly commits a fraud on the
> court—a party, an attorney, or a nonparty
> witness—the court has the inherent power to
> conduct proceedings to investigate that
> allegation and, if it is proven, to punish that
> conduct."); *Corder v. Howard Johnson &*
> *Co.*, 53 F.3d 225, 232 (9th Cir. 1994)
> ("[E]ven in the absence of statutory
> authority, a court may impose attorney's fees
> against a nonparty as an exercise of the
> court's inherent power to impose sanctions
> to curb abusive litigation practices."
> (citations omitted)).
>
> *Nimitz*, 2022 WL at 17338396 (alterations in the
> original).
>
> It makes no sense that a party could deprive a court of its
> inherent powers simply by filing a notice (or stipulation)
> of dismissal. *Haviland*, 561 F. App'x at 150. To hold
> otherwise would render district courts impotent to
> manage their cases in an orderly fashion and would foster
> abuse of our judicial system by unethical litigants and
> their attorneys.

*Backertop*, 2023 WL 3182084, at *4–5 (D. Del. May 1, 2023) (all but first

alteration in original) (footnote omitted).

Backertop and Ms. LaPray insist in their Motion that civil contempt is

"meant to benefit the complainant," and they seem to suggest that a court lacks the authority to impose *sua sponte* civil contempt sanctions. D.I. 54 at 1–2. But as the Supreme Court held in *Shillitani v. United States*, 384 U.S. 364 (1966):

> There can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt. And it is essential that courts be able to compel the appearance and testimony of witnesses. . . . Where contempt consists of a refusal to obey a court order to testify at any stage in judicial proceedings, the witness may be confined until compliance. The conditional nature of the imprisonment—based entirely upon the contemnor's continued defiance—justifies holding civil contempt proceedings absent the safeguards of indictment and jury, provided that the usual due process requirements are met.

*Id.* at 370–71 (citations and footnotes omitted). Thus, "it is . . . not necessary that a party—as opposed to the court—raise the concerns that necessitate the exercise of the court's inherent powers." *Backertop*, 2023 WL 3182084, at *6 (D. Del. May 1, 2023). "As the Supreme Court held in the seminal case, *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944), 'it cannot be that preservation of the integrity of the judicial process must always wait upon the diligence of litigants.'" *Id.*

Backertop and Ms. LaPray also argue that the order compelling Ms. LaPray to attend the July 20 hearing is invalid and that "[c]ourt orders that are transparently invalid . . . need not be obeyed and can be challenged in a contempt proceeding." D.I. 54 at 4. On the contrary, as the Supreme Court held in *Maggio*

5

*v. Zeitz*, 333 U.S. 56 (1948):

> It would be a disservice to the law if we were to depart
> from the long-standing rule that a [civil[6]] contempt
> proceeding does not open to reconsideration the legal or
> factual basis of the order alleged to have been disobeyed
> and thus become a retrial of the original controversy.
> The procedure to enforce a court's order commanding or
> forbidding an act should not be so inconclusive as to
> foster experimentation with disobedience.  Every
> precaution should be taken that orders issue . . . only after
> legal grounds are shown and only when it appears that
> obedience is within the power of the party being coerced
> by the order.  But when it has become final, disobedience
> cannot be justified by re-trying the issues as to whether
> the order should have issued in the first place.

*Id.* at 69 (citations omitted); *see also Marshak v. Treadwell*, 595 F.3d 478, 486 (3d

Cir. 2009) ("As we have frequently stated, a party who is alleged to be in contempt

of a court order may not challenge the substantive merits of that order within

contempt proceedings."); *Harris v. City of Philadelphia*, 47 F.3d 1311, 1326 (3d

Cir. 1995) ("The validity of the underlying order is not open to consideration" in a

civil contempt proceeding.).  As made clear in the May 1, 2023 Memorandum

Opinion; the May 31, 2023 Memorandum Order; the July 10, 2023 Memorandum

Opinion; and *Nimitz*, I took "every precaution" in the instant actions to ensure that

I had jurisdiction and sufficient legal grounds to order Ms. LaPray to attend the

---

[6] The Court expressly stated in *Maggio* that the matter before it was a "civil
contempt proceeding to coerce obedience."  333 U.S. at 67.

6

July 20, 2023 hearing.  Accordingly, that order's "alleged infirmities cannot be relitigated or corrected in a subsequent contempt proceeding." *Maggio*, 333 U.S. at 69.

Backertop and Ms. LaPray also argue that "failure to vacate the proceedings would violate Backertop and Ms. LaPray's due process rights." D.I. 54 at 3.  But they do not cite any legal authority in support of this assertion or explain why compelling Ms. LaPray to attend a hearing deprives her or Backertop of due process.

Backertop and Ms. LaPray insinuate that I violated their Fifth Amendment due process rights by not apprising them of their "rights as regards to criminal proceedings."  I say this because they fault me for "rais[ing] the possibility of fraud on the court, a criminal offense, without first advising either Backertop or Ms. LaPray of her [sic] rights as regards to criminal proceedings." D.I. 54 at 6; *see also* D.I. 54 at 8 ("This Court has been compelling Backertop and Ms. LaPray to provide testimonial and documentary evidence without advising them of *their* [sic] rights in the face of a possible criminal prosecution." (emphasis added)). Backertop and Ms. LaPray do not identify what "rights as regards to criminal proceedings" they have in mind.  The only "advice of rights" obligation that comes to my mind is the requirement under *Miranda v. Arizona* that law enforcement officers inform the subject of a custodial interrogation of the subject's Fifth

7

Amendment privilege against self-incrimination and the right to have an attorney

present during the interrogation.  384 U.S. 436, 444 (1966).  Putting aside the fact

that Backertop, as a corporate entity, does not enjoy a Fifth Amendment right

against compelled self-incrimination, *Braswell v. United States*, 487 U.S. 99, 104

(1988), "*Miranda* warnings are not required in civil court proceedings," *United*

*States v. Rodriguez*, 70 F.3d 121, 121 (9th Cir. 1995); *see also United States v.*

*Kilgroe*, 959 F.2d 802, 805 (9th Cir. 1992) ("[E]xcept in the context of custodial

interrogation, *Miranda* leaves the responsibility for keeping a citizen informed of

his constitutional rights with the preeminent guardian of those rights: the citizen

himself.").  In any event, even *if Miranda* were somehow violated here (as silly as

it sounds to say that), "a violation of *Miranda* is not itself a violation of the Fifth

Amendment," *Vega v. Tekoh*, 142 S. Ct. 2095, 2108 (2022), and the sole remedy for

a *Miranda* violation is the suppression of the defendant's statements and the fruits

thereof in criminal cases.

Backertop and Ms. LaPray's "failure to advise" argument is also moot.

Because, as I have previously stated, I am concerned about who the real parties in

interest are in these cases and who actually controls Backertop, I had planned on

informing Ms. LaPray before questioning her at the July 20 hearing and will

inform Ms. LaPray before questioning her at any future hearing that she has a right

to have an attorney represent her personally (as opposed to Backertop) in these

matters. And because, as I have previously stated, I am concerned about the possibility that real parties in interest such as Mavexar and IP Edge may have perpetrated a fraud on the court, I had also planned on telling Ms. LaPray at the July 20 hearing and will tell her before questioning her at any future hearing that she has a Fifth Amendment right to refuse to answer any question if she "'reasonably believes' her testimony 'could be used in a criminal prosecution or could lead to other evidence that might be so used.'" *United States v. Morton*, 993 F.3d 198, 203 (3d Cir. 2021) (quoting *Kastigar v. United States*, 406 U.S. 441, 444–45 (1972)).[6]

Finally, Backertop and Ms. LaPray argue that "[i]f the hearing is to go forward, it must be with another judge" because I "cannot serve as both investigator and judge." D.I. 54 at 10–11 (emphasis omitted). In support of this contention, they cite *In re Murchison*, 349 U.S. 133 (1955), for the proposition that "[t]here is a presumption of bias when a judicial decision maker has the dual role of investigating and adjudicating disputes and complaints." D.I. 54 at 10. *Murchison*, however, does not stand for this broad conclusion. Instead, "its

---

[6] Under Third Circuit law, a witness cannot make a blanket invocation of the Fifth Amendment privilege but must instead assert the privilege on a question-by-question basis so that the court can assess the propriety of invoking the privilege against specific circumstances and questions. *Nat'l Life Ins. Co. v. Hartford Accident & Indem. Co.*, 615 F.2d 595, 596 (3d Cir. 1980).

holding, as opposed to dicta, is confined to the basic constitutional principle of prohibiting a judge from adjudicating a case where he was also *an investigator for the government.*" *Johnson v. Carroll*, 369 F.3d 253, 260 (3d Cir. 2004) (emphasis added). I am, of course, not acting as an investigator for the government.

*Murchison* is also not relevant here because it addressed criminal contempt, not civil contempt. The Court held in *Murchison* that a state judge, empowered under Michigan law to sit as a "one-man grand jury" and to compel witnesses to testify before him in secret about possible crimes, violated the due process clause of the Fourteenth Amendment when he "charged two such witnesses with criminal contempt, one for perjury and the other for refusing to answer certain questions, and then himself tried and convicted them." *Withrow v. Larkin*, 421 U.S. 35, 53 (1975) (citing *Murchison*, 349 U.S. at 138). Unlike criminal contempt proceedings, "civil contempt proceedings leave the offended judge solely responsible for identifying, prosecuting, adjudicating, and sanctioning the contumacious conduct." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 831 (1994).

This proceeding is a civil contempt proceeding because its purpose is to coerce Ms. LaPray into complying with an order to appear in person and answer questions related to Mr. Chong's withdrawal motion and Backertop's document production. *See* D.I. 53 at 8:22–25. As the Third Circuit explained in *United*

10

*States v. Harris*, 582 F.3d 512 (3d Cir. 2009):

> Civil contempt orders are intended to be coercive or compensatory in nature, and do not require, *inter alia*, a jury trial. Rather, civil contempt is imposed by the judge upon a finding that one has failed to comply with a valid court order. *See Shillitani v. United States*, 384 U.S. 364, 370–71, 86 S. Ct. 1531, 16 L.Ed.2d 622 (1966) ("The conditional nature of the imprisonment—based entirely upon the contemnor's continued defiance—justifies holding civil contempt proceedings absent the safeguards of indictment and jury, provided that the usual due process requirements are met.") (internal citations and quotations omitted); *Bagwell*, 512 U.S. at 827, 114 S. Ct. 2552 ("[C]ivil contempt sanctions, or those penalties designed to compel future compliance with a court order, are considered to be coercive and avoidable through obedience, and thus may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard. Neither a jury trial nor proof beyond a reasonable doubt is required.").

> With civil contempt, the contemnor will be released subject to compliance with some condition. He is thus understood, in a by-now familiar observation, to "carr[y] the keys of his prison in his own pocket." *Bagwell*, 512 U.S. at 828, 114 S. Ct. 2552 (internal citations and quotations omitted).

*Id.* at 514–15 (alterations in original).

To sum up, then: Backertop and Ms. LaPray have not demonstrated good cause to justify Ms. LaPray's refusal to attend the July 20 hearing and future hearings. And, as it is undisputed that Ms. LaPray was given notice of the August 1 show-cause hearing and an opportunity to be heard, I will find her in civil contempt. *See Bagwell*, 512 U.S. at 827 (Civil contempt "may be imposed in an

11

ordinary civil proceeding upon notice and an opportunity to be heard."); *Harris v. City of Philadelphia*, 47 F.3d 1311, 1322 (3d Cir. 1995) ("For an indirect contempt, such as failure to obey a court order, it is appropriate to give notice by an order to show cause and to hold a hearing.").

## II.

Courts are given wide discretion to craft appropriate sanctions for civil contempt. *Elkin v. Fauver*, 969 F.2d 48, 52 (3d Cir. 1992). "The paradigmatic coercive, civil contempt sanction . . . involves confining a contemnor indefinitely until he complies with an affirmative command . . . .'" *Bagwell*, 512 U.S. at 828 (citations omitted). But another appropriate sanction is a fine that can be avoided if the contemnor performs the act required by the court. *Roe v. Operation Rescue*, 919 F.2d 857, 868 (3d Cir. 1990). In exercising its discretion, the Court must "inevitably . . . engage in a fair amount of 'judgment calling' based upon its experience with the case." *Bell v. United Princeton Props., Inc.*, 884 F.2d 713, 721 (3d Cir. 1989).

At this stage, I believe a fine is the appropriate sanction, as I am hopeful the avoidance of having to pay a fine will provide sufficient motivation for Ms. LaPray to change her mind and comply with the order to appear in this Court for questioning. A fine also comports with the principle that "in contempt proceedings courts should never exercise more than 'the least possible power adequate to the

end proposed.'" *United States v. United Mine Workers of Am.*, 330 U.S. 258, 332 (1947) (Black, J., concurring in part and dissenting in part) (quoting *Anderson v. Dunn*, 6 Wheat. 204, 231 (1821); *In re Michael*, 326 U.S. 224, 227 (1945)).

"[I]n fixing the amount of a fine to be imposed as a punishment or as a means of securing future compliance, [a court should] consider the amount of [the contemnor's] financial resources and the consequent seriousness of the burden to that particular [contemnor]." *United Mine Workers*, 330 U.S. at 304. The record here offers little evidence with respect to Ms. LaPray's financial resources. When I asked Backertop's counsel at the August 1 hearing about Ms. LaPray's finances and salary, he said he could only "glean" that she was "not of great means." D.I. 55 at 4:10–24. We know from the record that Ms. LaPray is a full-time paralegal in Dallas, Texas. D.I. 40-3 ¶¶ 4, 6. It appears that paralegal salaries in Dallas, Texas range from $44,795 to $118,286 with an average salary between $67,715 and $88,521.[9] As of November 10, 2022, approximately $2,000 of the proceeds from Backertop's lawsuits had been deposited into Ms. LaPray's personal bank account. D.I. 24 at 35:3–19. Ms. LaPray may or may not earn additional income from her work as the chairwoman of the Dallas GOP. D.I. 24 at 12:19–22.

---

[9] *See Paralegal Salary in Dallas,* TX, Salary.com, https://www.salary.com/research/salary/general/paralegal-salary/dallas-tx (range from $58,766 to $118,286 with an average of $88,521); *Paralegal Salary in Dallas, TX,* Indeed.com, https://www.indeed.com/career/paralegal/salaries/Dallas--TX (range from $44,795 to $102,362 with an average of $67,715).

Her husband is a lawyer, and he also works to support their family.  D.I. 40-3 ¶ 7;
D.I. 24 at 13:10–14:10.

Given these circumstances, I find that a $200 per day fine is appropriate and
will impose that fine against Ms. LaPray starting August 23, 2023.  Beginning on
that date, Ms. LaPray will be fined $200 every day that the Court is open and Ms.
LaPray does not appear in court.  Ms. LaPray can purge her contempt by notifying
the Court that she is prepared to appear at a hearing and then attending that hearing
in person.  (After Ms. LaPray notifies the Court that she is prepared to appear in
person at a hearing, the Court will endeavor to promptly schedule that hearing.)

### III.

As noted above, an alleged contemnor cannot challenge the validity of the
underlying order within the civil contempt proceeding.  Nonetheless, most of the
arguments set forth in Backertop and Ms. LaPray's Motion focus on the validity of
the underlying order.  Because these arguments are irrelevant to the issue before
me, I have largely ignored them.  But I think it prudent to address two of the more
misleading arguments Backertop and Ms. LaPray make with respect to the validity
of the underlying order.

First, Backertop and Ms. LaPray purport to quote from *Kisor v. Wilkie*, 139
S. Ct. 2400, 2413 (2019), the statement that "[c]ourts cannot conduct factual
investigations."  *See* D.I. 54 at 5.  There is, however, no such statement in *Kisor*.

What Justice Kagan actually wrote on page 2413 of *Kisor* is: "Agencies (unlike courts) can conduct factual investigations, can consult with affected parties, can consider how their experts have handled similar issues over the long course of administering a regulatory program." 139 S. Ct. at 2413 (plurality opinion). Putting aside the fact that Justice Kagan was not writing for a majority of the Court when she wrote this sentence, Justice Kagan was speaking here of "factual investigations" in the context of policy-driven fact finding that federal agencies (and not courts) engage in before promulgating regulations. As she noted in the immediately preceding sentences in her opinion: "Congress . . . is attuned to the comparative advantages of agencies over courts in making such policy judgments. Agencies (unlike courts) have unique expertise, often of a scientific or technical nature, relevant to applying a regulation to complex or changing circumstances." *Id.* (internal quotation marks and citations omitted). To be clear, Justice Kagan was not saying in her plurality opinion in *Kisor* that courts are prohibited from conducting factual inquiries. And in any event, a majority of the Supreme Court explicitly held in *Chambers v. NASCO, Inc.* that "a court has the power to conduct an independent investigation in order to determine whether it has been the victim of fraud." 501 U.S. 32, 44 (1991).

Second, Backertop and Ms. LaPray accuse me of improperly reading in open court from "documents Backertop had classified as subject to the attorney-client

privilege." D.I. 54 at 7.  In an earlier filing, incorporated by reference in the

Motion, Backertop and Ms. LaPray made the same accusation and further stated

that my reading of the documents was "in direct contradiction to the Court's

representations to the Federal Circuit that it would keep such documents *in*

*camera*" and had "den[ied] Backertop the opportunity to appeal a ruling on

privilege prior to such public disclosure." D.I. 48 at 17.

    As an initial matter, none of the documents from which I read in open court

on June 8 and July 20 are privileged.  Second, I read from the documents in the

presence of, and—except for one instance—without objection from, Backertop's

counsel.[8] *See* D.I. 41 at 13–28 (June 8 hearing exhibit 1 discussion), 28–41, 43–52

(exhibit 2), 41–43, 46–47 (exhibit 3), 54–63 (exhibit 4), 62–74 (exhibit 5), D.I. 53

at 12:3–15:24 (July 20 hearing document discussion).  The only time counsel

objected to the reading in open court of a document occurred during the July 20

---

[8] Exhibit 5 from the June 8 hearing came from Mellaconic IP LLC's document production. Mr. Chong is also counsel of record for Mellaconic. *See Mellaconic IP LLC v. TimeClock Plus,* LLC, No. 22-244; *Mellaconic IP LLC v. Deputy, Inc.,* No. 22-541. At the June 8 hearing, I repeatedly noted that Backertop's document production was inadequate, *see* D.I. 41 at 7, 17, 29, 31, 94, 98, and I stated that "there seems to be documents produced in other cases that you would have expected to see in the production in this case," D.I. 41 at 7:16–23. An example of the latter is Exhibit 5, which consists of communications involving Mr. Burns (who is counsel of record for Backertop but not for Mellaconic) and appears to be responsive to the document production order. Exhibit 5 was produced by Mellaconic but not by Backertop.

hearing when I questioned counsel about documents that appeared to be missing

from Backertop's production:

> THE COURT:  So, for instance, there is, in the document production that we just got from you within the last hour. I realize you may have filed it yesterday or instructed deliverers yesterday, but we didn't get it until a few minutes ago.  But just quickly looking at it, there's at least two instances I saw that have a link to a lockbox of documents that apparently were provided to Ms. LaPray by Mavexar-type people.  I didn't see the contents of the lockbox in here.
>
> MR. CHONG:  Lockbox?
>
> THE COURT:  Yeah.  Did I say lockbox?  That's my, sorry, my age showing.  A Dropbox.
>
> MR. CHONG:  Oh, a Dropbox.
>
> THE COURT:  Let me give you another example. You've got -- and you've designated this confidential. The very first document is the agreement between your law firm, right, and Backertop.  You've produced these same agreements during hearings with no assertion of privilege, how is that privileged here?
>
> MR. CHONG:  They were produced -- when they were previously produced -- and I have to go back and check the records -- my understanding was that we were producing everything under privilege, and that's why they were not filed.
>
> THE COURT:  But you've introduced this at a hearing in front of me.  Right.  You actually put up the letter.  And there was no objection.  No?

MR. CHONG:  I would have to recall that.  I mean, I would like to go back and look into that.  I believe -- I don't -- I don't recall off the top of my head.

THE COURT:  Okay, then let's tackle this.  Then I've got a copy of an engagement letter.  There is no cover e-mail.  There is nothing that you would expect to see as to how this document got transported between your law firm and Ms. LaPray, how signatures got on it, right.  In your production, there's nothing attached to that.  I mean, do you remember how you ended up getting in Ms. LaPray's hands an engagement letter, how it was executed by her, how you got it back?  Do you remember anything about that?

MR. CHONG:  I don't.  I mean, I produced everything -- I went through my search on my e-mail, and everything that was on my search, I produced.  I don't recall specifically.  I don't, Your Honor.

THE COURT:  All right.  Well, then, you know, when I look at -- do you have this production in front of you by any chance?

MR. CHONG:  Yes, Your Honor.

THE COURT:  So, like, if you turn to Page 26.  There's an e-mail there from you to Mr. Burns.  It says, "attachment image 1, image 2."  I don't see them in here.  At least I don't think I do.

MR. CHONG:  I think that's just his -- his firm logo.

THE COURT:  Okay.

MR. CHONG:  That's the attachment is his firm logo.

THE COURT:  All right.  Then turn to the next page, Page 28, here's the Dropbox, right?  Folks from IP Edge

18

are informing Mr. Burns that here's the link to the
Dropbox that Backertop has with –

MR. CHONG:  I guess, so this information, I think -- I
believe this is attorney/client privilege, and I think at this
point, if we were to discuss this, I think if we could seal
the courtroom, and we could –

THE COURT:  I'm not going to seal the courtroom.  I
haven't discussed anything that could reasonably be
characterized as attorney/client privilege.  All I'm talking
about is a link to a Dropbox.  That's it.  I'm not asking
about the content of the Dropbox, and I'm not going to
seal the courtroom.  All I want to know is, can you tell
me where the documents located in the Dropbox are?
Were they produced?  That's all I'm looking for.

MR. CHONG:  I guess I would have to go and see if that
link is still active.  I don't know.

THE COURT:  So you don't know.  So it doesn't sound
like you're in a position to say that you really have done
anything other than obtain oral confirmation from Ms.
LaPray that Backertop's document production is
complete; is that fair?

MR. CHONG:  From Ms. LaPray, Mr. Burns, Mavexar.
And I had, you know, went through the attachments as of
the last hearing and produced the attachments from my e-
mails that I had in my possession.  And other than that, I
don't have access to their Internet system, so I cannot
access their Internet system, so I can just only produce
what I have and ask them.

THE COURT:  All right.  But you've produced all the
attachments to the e-mails that you've produced; is that
fair?

MR. CHONG:  Yes, that is correct.

19

D.I. 53 at 12:3–15:24.  Clearly, there was no disclosure of privileged communications during this colloquy with counsel.

Third, I never "represent[ed] to the Federal Circuit that [I] would keep [documents produced by Backertop or any other entity] *in camera*."  D.I. 48 at 17.

Fourth, and finally, I did not "deny[ ] Backertop the opportunity to appeal a ruling on privilege prior to" reading from its documents in court.  D.I. 48 at 17. But in any event, a party is not entitled to appeal an adverse ruling on privilege before a district court makes public documents or testimony that are manifestly not privileged.  If a party were so entitled, then the judicial system would grind to a halt, as discovery, depositions, trials, and hearings would be put on hold every time a court overruled a privilege objection.  I recognize that in certain circumstances— such as where the privilege determination is a close call or a matter of first impression—a stay may be appropriate to allow a party to seek mandamus review of a privilege ruling.  But I have yet to be presented with such circumstances in these cases.

IV.

For the reasons discussed above, I will find Ms. LaPray in civil contempt of court and sanction her to a $200 per day fine until Ms. LaPray appears in person in court.

The Court will enter an appropriate order.

20